## Case No. 13,400.

### STEVENS v. GLADDING et al.

[8 N. Y. Leg. Obs. 297.]

Circuit Court, D. Rhode Island. July 18, 1850.

COPYRIGHT—SALE UNDER EXECUTION OF PLATE—WHAT PASSES TO PURCHASER.

A purchaser under a sheriff's sale of a copperplate on which a map is engraved acquires the right to take impressions therefrom and sell them.

This was a qui tam action brought against the defendants [Royal Gladding and Isaac T. Proud], to recover certain penalties under the act of congress for the protection of copyrights [4 Stat. 436]. The plaintiff [James Stevens] was the author of a map of Rhode Island, and sued the defendants, who are booksellers at Providence, R. I., for selling copies of the map. The defendants, among other things, justified their selling the maps under the title of Isaac H. Cady, procured by the purchase of the copperplate under an execution in a state court against the plaintiff. The great question was, what passed to the purchaser under the sheriff's sale? Did he purchase the right to print maps from the plate and sell them, or did he purchase simply the material? In other words, did he acquire any copyright privileges by the purchase, and were those rights in the plaintiff liable to be sold and divested by an execution? If they could be, then the defendants, acting under the authority of Cady, the purchaser, claimed to be justified. If not, then it was claimed they were liable to the penalty given by the act of congress. The proof established the authorship, and the taking of the necessary steps required by the act to secure the copyright, and the sale of copies by the defendants. On the other hand, there was established the sale of the plate under the execution against plaintiff, the purchase by Cady, and his authority to defendants to sell the maps. As this case presented the same points as in the case of Stevens v. Cady [Case No. 13,395], in the equity side of the same court, some time before, and passed upon by the same judges, and as the judges respectively adhered to the same opinions, Justice WOODBURY read to the jury the following opinion, Judge PITMAN dissenting from it; this division of opinion entitling the parties to take the case to the supreme court of the United States.

Henry M. Western, for plaintiff.

Seth P. Staples and Mr. Aimes, for defendants.

WOODBURY, Circuit Justice. This was a bill in chancery, averring that the plaintiff was the author and proprietor of a certain map of the state of Rhode Island; that he took out a copyright therefor, and caused an engraving to be made of the map, and never consented to the sale of it by others, but is still the sole proprietor thereof. It was further alleged that, notwithstanding this, the respondent and others confederated together to deprive him of his lawful gains, and in the year 1846 published and sold another map similar in substance to his, with only a few trifling alterations and additions; that the plaintiff's copperplate engraving of the map has for some time been laid aside, with a view to engrave said map on steel, and yet said Cady is believed in some way, without his consent, to have obtained and used that copperplate, and sold a large number of copies thereof, and thus forfeited one dollar for every sheet so printed and published; that the plaintiff had requested said Cady to abstain from publishing more copies, and to deliver the plate to him, which he refuses, and which the plaintiff prays this court to

require and enforce. Certain interrogatories were put and requested to be answered, and oath was made to the bill, January 27, 1847. The answer avers that some one sued Stevens, and recovered judgment against him in the state court of Massachusetts, April 11, 1846, for $194, and the sheriff levied the execution on the plate upon which the map of Stevens had by him been engraved, and sold the plate at public auction; that it was purchased by the respondent, as the highest bidder, for $250, and that he thereby became authorized to use the same, and did use it for striking off maps, which afterwards had been sold by him; that without the right thus to use it, and sell the maps thus engraved, the plate would be worth only the metal, or less than $10. Some evidence was put into the case which will be referred to in the opinion, when necessary,—the chief object being now to present the question, first, what property and rights passed to the defendant by the purchase of the plate; and, next, whether an injunction ought to be granted, on all the pleadings and evidence in the cause as they now stand.

The case was argued at the June term, 1849, by Mr. Stevens, for himself, and Mr. Bradlee, for defendant.

It is conceded, in the argument in this case, that the judgment against the plaintiff was regular, and the sale by the sheriff of the engraved plate valid to pass the title to the plate itself. But the plaintiff contends that no right to use it for printing maps, nor any part of his copyright to maps taken from it afterwards, was thus transferred, nor any interest beyond the mere metal of which the plate was composed. Some general questions seem to be involved in this part of the controversy, which are first to be considered, and are not without difficulty. One is, whether a right to use the plate for engraving maps would, as a general principle, pass by the sheriff's sale of the plate. Another is, whether there is anything in the patent laws, or in the nature of a copyright, which would prevent it from thus passing to the copies of a map struck afterwards by the purchaser from such a plate. I am inclined to think that all the qualities, uses, and powers belonging to the plate in the condition in which it was at the sale, and with which it had been invested by the owner of it, composed a part of its value. They were, a part of its design and uses, were incident to the plate itself, and where that was duly transferred to another, the incident to it, the use of it, and its engraving as there practised, must, I think, be considered as going with it. This question is not beyond doubt, but clearly the levy and sale were not described nor regarded as so much copper in the form of a plate, without any engraving thereon, or, if not without the engraving, yet without any authority to use it. The engraving was as much a part of the plate as the copper itself,

and was as much sold as the raw copper. Indeed, the use of the engraving to make copies entered more into the value and price of the plate than the metal itself, or, as is avowed in the answer, much less would have been given for the plate. This increased value had been imparted to the metal by the plaintiff, for the purpose of having the plate employed in the engraving, and reaped the benefit of this increased value on account of the application of the plate to that purpose, and its sale for something above $240 more than the metal would have brought. Nor would a sale so construed have an injurious effect on the plaintiff. He not only obtains an enhanced price on account of the engraving and the use of it with the plate, but his copyright to his map is still retained, except so far as it may be involved in the copies subsequently struck from that particular plate by the purchaser. He can enforce his exclusive right to all copies struck off while he remained owner of it, and can also enforce it in similar or improved plates, made by himself after the sale, because all the copyright to the map is still in him which has not been in some way transferred to others. He can have the renewal or extension of his copyright, too, and protect it against everything not embraced in the decision in Wilson v. Rosseau, 4 How. [45 U. S.] 646.

A different view from this, not passing the right to use the plate, would, in truth, injure both the plaintiff and his creditors. The plate would belong to the purchaser, and the right to use it for printing to the plaintiff. Its value, so considered, would be much less to both; whereas, on our construction the value would be enhanced to both. In any other view, too, all would not pass which was incident to the plate and engraving owned by him, at the sale, and as he and his creditors have been paid for. The plate and engraving had before, in practice, been actually employed to strike off maps to be sold, and the copyright to each to pass to the purchaser of each, as an incident. The usage is often a test of what exists, and what was meant to be passed as incident. See Taft & Manchester's R. (June, 1849) Id. In cases like this, as in patents, the usage is, when selling the means or material or machinery to make a patented article, to consider the right or license to make it as passing at the same time. Brooks v. Byam [Case No. 1,948]; Curt. Pat. § 135. Again, the design of the parties as to what shall pass, is to be inferred from all the circumstances, and when once fairly elicited, should control the construction. Here the design in having a plate was to use the plate and engraving to strike off maps. The actual previous use had corresponded with this design, and hence the sale of the plate and engraving, while so in use, must be presumed to have been with the design that the purchaser should continue a like use. The princi-

clearance from showing that the primary destination of the voyage was to Newbern, and that by the setting sail on the voyage which might end at Beaufort with contraband articles on board, the condition of the license was not broken, and the vessel and cargo not forfeited to the United States, although the claimant of the cargo knew the spirits were on board, and had been declared contraband by the secretary of the treasury.

W. A. Field, for libellants.
J. C. Dodge, for claimants.

LOWELL, District Judge. This libel of information, filed November 19, 1862, alleges a forfeiture of the schooner and her cargo for undertaking to carry goods from the state of Massachusetts to the state of North Carolina contrary to section 5, St. July 13, 1861 (12 Stat. 257). The schooner belonged to her master, John E. Dole, who chartered her to Addison, Gage & Co., of Boston, for a voyage to Newbern. The charterers were acting only as agents of one Aaron Gage, who was engaged in business at Newbern, but was present in Boston during most of the time that the schooner was loading, and fitted her with ice and other merchandise, most of which he owned. The quartermaster of the United States also shipped a considerable quantity of potatoes for our troops at Newbern. It being uncertain whether a permit could be obtained to go to Newbern, a license was taken for Beaufort, with the alternative intent, on failure of such permit, to land the goods at that port, and transport them by rail to their destination. The schooner sailed November 14, 1862, and had gone about two miles down the harbor of Boston when she was seized, and it was found that there were three barrels of ardent spirits on board, which were marked "cider vinegar," and so entered on the manifest. The evidence rendered it probable that neither the master nor the charterers were aware of the contents of the three barrels, but that Aaron Gage was aware of it, and was interested in the spirits, either as owner or as consignee. The vessel and cargo, except the spirits, were claimed and released on stipulation, and proceeded to Hatteras Inlet, where, after some delay, a permit was obtained, and the voyage ended at Newbern, as originally contemplated.

The statute of the 13th of July, 1861, forbids all intercourse between the states and parts of states which the president shall declare to be in a state of insurrection, and all other parts of the Union, and forfeits all goods proceeding from one to the other, together with the vessel conveying them; provided that the president may license such intercourse in such articles, etc., as he may consider to be for the public interest to be carried on under regulations to be prescribed by the secretary of the treasury. The president, by his proclamation of August 16, 1861 (12 Stat. 1262), declared several states, including North Carolina, excepting such parts as may from time to time be occupied and controlled by forces of the United States engaged in the dispersion of the insurgents, to be in a state of insurrection.

At the time of this voyage and seizure both Beaufort and Newbern were occupied and controlled by our forces, and had been so for some eight months, together with a considerable part of the surrounding country. The inhabitants of those towns were not enemies, and trading with them was not trading with the enemy. The Venice, 2 Wall. [(69 U. S.) 258]. They were within the exception of the proclamation, and therefore excepted from the prohibition of the statute, which conclusively adopts, in advance, as insurrectionary territory, whatever the proclamation may declare to be such. The libel should have negatived the exceptions of the proclamation, as applied to the particular part of North Carolina to which this vessel was proceeding. I have had occasion lately to examine this point of negative allegation in an indictment, and the rule is not different in such a case as this. It is that, when an exception is so far made a part of the description of the offence that the offence cannot be laid in the language of the statute without referring to the exception, the latter must be referred to and negatived. Such is this case. The proclamation does not say that North Carolina is and shall be considered in a state of insurrection, but that North Carolina, excepting such parts, etc., is and shall be so considered. There is, therefore, a fatal variance between the libel and the proofs, and the objection is one of substance, because, if there be a forfeiture here, it is by reason of a breach of treasury regulations, and not of the statute of July 13. But as the claimants, by their answer, assumed to meet the case of a trading to Beaufort, and no surprise or injury has resulted to them, an amendment might perhaps have been allowed, if moved for at the trial, and may be hereafter, possibly, on appeal; and I will therefore consider the case as it was tried and argued.

The primary destination was to Newbern, as everybody perfectly well knew, and there was no fraud intended or practised in taking the license to Beaufort; and, although the answer sets up a voyage to Beaufort, this was not intended as any concealment. Nor was any distinction known to the claimants, then or afterwards, between the two ports, until I suggested it in court. Under these circumstances, I do not hold the claimants estopped by their license or by their answer from showing the truth of the case in reply to an information which merely alleges a voyage to North Carolina, though, if the libellants amend hereafter, it may be well for the claimants to do so too.

At this time trade to Newbern was governed by regulations established August 28, 1862, by the secretary of the treasury, with the concurrence of the secretaries of war and of the navy, which were printed, and may be presumed to have been known to the traders,

act of the patentee. When they pass to executors or administrators, it is without writing, and when they pass to creditors by a levy, it is often not voluntary, and if under the bankrupt law, it is, at times, without any writing. The act of congress refers to sales by the patentee under contract, as just adverted to. The writing is provided for there, too, for the sale of a separate and independent copyright, or a part of one; and not for a whole or a part, as incidental to a machine or a plate, and connected with these, and as if under a practical license to use them. A license to use a copyright or a patent right need not be either in writing or recorded. See cases post. So in all sales of patented articles, it is not necessary, as already shown, to reduce to writing and record the transfer of them, or of the patent right to the articles made and sold. The sale of the article is universally decreed a sale of the patent right to use it, or, in other words, a license to use it. That is the principle of the transaction. Any other restricted views would embarrass the business of the whole community, and be most fatal to the patentees and authors themselves. In any other view, the materials and machinery to make a patent medicine might be bought, with no right to make it, or the medicine itself be purchased with no right to swallow it. Hence, by a mere public sale or license, many patent rights, and doubtless some copyrights, are daily used, and legally used.

A parol license is enough to authorize a printing and publishing, now, of a manuscript of another. 2 Mer. 434; Jac. 34. Here, then, at all events, the sale by the sheriff for Stevens, may well be considered a license, in law, if not in fact, by the agent of both parties, for the purchaser to use the plate and engraving, and the maps struck from them. And there is nothing in the patent laws, or in sound principle, which should, between the parties, avoid such a license, when given, as here, for a good consideration, because it was done by parol or not recorded. Power v. Walker, 3 Maule & S. 7; 4 Camp. 8; 2 Starkie, 336; Brooks v. Byam [supra]; Curt. Pat. §§ 195, 197; Woodworth v. Edwards [Case No. 18,014], and cases there cited.

Something is said of a consent in writing and attested, being required to justify from a penalty one who prints and sells a copyright book of another. See section 6 of Act Feb. 3, 1831 (4 Stat. 437). But this is where the person printing and selling is not entitled to do it, or is acting entirely without right or title, in any way, in point of law. He must then have such a writing to exonerate him. That is not this case. Indeed, if an actual conveyance from the author of the map was, in a case like this, necessary to pass the right to a purchaser to use the plate in striking off copies, there would be strong equity in a court of chancery to make it on a state of facts such as exists here.

In conclusion: By these views it will be seen that a sale of this plate, and the incidental right to use it, with the engraving on it, is deemed as valid as if made by Stevens in person, and that Stevens, in such a sale without a written assignment, recorded in the proper office, must, in point of law, be considered as giving his consent or license to this use of the plate, through the sale of it by the sheriff for his benefit, and for a reasonable consideration paid for both the use and the plate by the defendant; nor can such a use of it, as before shown, injure the rights or interests of Stevens, but, on the contrary, increases their value. He is left to exercise all the rights not parted with on that occasion, and probably is still using, or preparing to use, them with another plate, nothing having passed from him but this particular plate, and the engraving on it, and the right or license to use them, which was incident to and involved in them, and fully paid for. It is stated in the bill that this plate had been used for some years, the demand for maps from it chiefly supplied, and the plaintiff was preparing to complete another plate, with improved materials and in better style. Now, if after all this, if after a quasi license to use, no less than a sale of his old plate to a third person for a valuable consideration, by an agent appointed by law, the author thinks proper to revoke the license, it will be seen hereafter that no court of equity can countenance it as if it was equitable and just, by lending to such an attempt an extraordinary remedy in equity, unless there was mistake or surprise, and unless the sum paid to him, or the officers for him, is first refunded.

But, before examining the last considerations, there seems to be another ground set up against the sale by the sheriff, which comes under the present head, and this is, that a copyright or patent right is not liable at all for the debts of an author or patentee. But it has been deliberately decided that a patent for making paper out of straw, etc., passed by operation of law to pay the debts of a bankrupt, in respect to such a patent, obtained even after bankruptcy. Lord Alvanley, C. J., says, in Hesse v. Stevenson, 3 Bos. & P. 578: But if he avail himself of his knowledge and skill, and thereby acquire a beneficial interest "which may be the subject of assignment, I cannot frame to myself an argument why that interest should not pass in the same manner as any other property acquired by his personal industry." "The plaintiff here was none the less a debtor than if a bankrupt law existed, nor were the defendants any the less purchasers for the creditors, nor should any of his property of any kind, and especially his personal estate, be withheld from creditors any more than under a bankrupt law." Sawin v. Guild [Case No. 12,391]. This idea may have arisen from the circumstance that, once, a manuscript was not regarded as passing to assignees or creditors, but that rested on par-

ticular reasons. Burrows, 2394–2397; Curt. Copyr. p. 85, note 86. See a provision in our own statute on this. But now, by 5 & 6 Vict. c. 45, all the copyrights are made personal property, and may be bequeathed or distributed, like other personal property. Curt. Pat. 218, note. A copyright now clearly passes to assignees of a bankrupt. 2 Russ. & R. 385, 392; 17 Ves. 338; 2 New Reports, 67; Curt. Copyr. 231; Longman v. Tripp, 5 Bos. & P. 70. The case of Sir Walter Scott's copyright going towards the discharge of his debts, is familiarly known to most of the literary world.

I understand, from my colleague, who will soon present his views, that he does not concur in mine, that the right to use this plate in striking off copies of the map passed to the defendant by the sale. But there is another question arising in the case, yet to be considered, and before referred to, on which I believe we do not differ; that is, whether the extraordinary mode of relief by injunction, asked here in equity, ought to be granted, where the title is in controversy, without a previous offer to restore the money paid by the sale of the plate. A party in chancery, who seeks equity, must first do equity; and till the rights, if contested, are settled by an action at law, it does not seem just to interfere, unless the complainant, at least, offers in his bill to pay back what he or his agent, the officer in his behalf, has received of the respondent for the plaintiff and his creditors. Woodworth v. Woodbury.[1] Should the complainant be willing to do this, and move to amend his bill for that purpose, it can be allowed, and there then would be some plausible ground for this relief asked for, though not a very decisive one till it is settled at law that the right to the use of the engraving on the plate did not pass with the plate itself. Platt v. Button, 19 Ves. 447. But it would seem palpably unjust in equity to let the complainant retain the right in a contested and very doubtful case for which he has been paid through the sheriff, and not refund the money thus received. Walcot v. Walker, 7 Ves. 1; Millar v. Taylor, Burrows, 2401.

The plaintiff declined to make any amendment, or to restore the money received. The application for an injunction was therefore overruled, and the bill dismissed.

[NOTE. An appeal was taken by the plaintiff in the case against Cady to the supreme court, where the decree dismissing the bill was reversed, upon the ground that the purchaser at the execution sale of the copperplate did not thereby acquire any right to print therefrom. The cause was remanded. 14 How. (55 U. S.) 528. Upon the rehearing of the case in the circuit court an injunction was entered, but the plaintiff was denied an account, upon the ground that an account was not prayed for in the bill. Case No. 13,395. This last position was also reversed by the supreme court, upon appeal, in the chancery suit against Gladding et al., when it was held that, in copyright and patent cases, an account was incident to the right to an injunction. 17 How. [58 U. S.] 447. The circuit court subsequently decided, in the suit against Gladding et al., that the commissions on sales of the maps must be accounted for as profits. Case No. 13,399.]

STEVENS (HACKER v.). See Cases Nos. 5,887 and 5,888.

---

[1] [See Woodworth v. Rogers, Case No. 18,018.]

